UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

    Plaintiff,

v.                                           Criminal Case No. 19-20720

Brandon Miles,                    Sean F. Cox
                                                  United States District Court Judge

    Defendant.
_____/

**OPINION & ORDER
DENYING DEFENDANT'S MOTION TO SUPPRESS**

In this Criminal Case, Defendant Brandon Miles is charged with drug and firearms offenses. Those charges stem from the execution of search warrants at two homes. The matter is currently before Court on Defendant's Motion to Suppress that challenges the two search warrants that authorized searches of the homes, the search of a Lincoln Town Car during the execution of the search warrant on LaSalle Street, and Defendant's custodial statement given on the day after the searches. The motions have been briefed and a zoom hearing was held on July 31, 2020. For the reasons set forth below, the Court shall DENY the motion.

**BACKGROUND**

**A.**     **Procedural Background**

On February 10, 2020, Defendant filed a Motion to Suppress. (ECF Nos. 33 & 34).[1] After the motion was fully briefed, the Court held a zoom hearing on July 31, 2020. Prior to that hearing, Defendant agreed, on the record, to proceed with a zoom hearing rather than an in-

---

[1]The same motion was filed twice.

1

person hearing.

**B.     Factual Background**

On October 3, 2019, DEA Special Agent Brian W. Sams sought and obtained two search warrants from Magistrate Judge R. Steven Whalen.  (ECF Nos. 47-2 and 47-3).   One search warrant was sought for the "Target Premises 1," a house located on LaSalle Street in Detroit and the other for "Target Premises 2," a house located on Bramell Street in Detroit.

Both search warrant applications were supported by the same search warrant affidavit, prepared and signed by Special Agent Sams.  In that affidavit, Sams included several pages detailing his training in criminal drug investigations and his participation in numerous investigations as a DEA Special Agent.  The affidavit explained that Target Premises 1 (the LaSalle Street house) would be searched in order to seize documents and other non-narcotics related to the target offenses, while Target Premises 2 (the Bramell Street house) would be searched in order to seize both narcotics and non-narcotics related evidence.

Attachments A to the search warrant applications gave a more full description of the Target Premises, while Attachments B specified the items to be sought and searched.

The affidavit included general information concerning drug traffickers, and how they operate and engage in drug trafficking operations.

It also includes a section discussing "Cooperating Defendant Information," that details a cooperating Defendant referred to a DEA-1.  It states that "DEA-1 has cooperated with DEA since October 2019 and has provided information to DEA in the past that has been deemed reliable."  (Affidavit at 12).   It explains:

> 29.   In October 2019, DEA-1 was encountered on a traffic stop by the Michigan State Police.  During the stop, DEA-1 was found to be in possession of quantities

> of 62.1 gross grams of fentanyl, 104 gross grams of cocaine and 48.8 gross grams of crack cocaine (all weights include packaging).
>
> 30. Subsequent to the above traffic stop, DEA-1 stated that his source of supply was a black male by the name of "SHUE". DEA-1 stated that "SHUE" has a house on the southeast corner of Bramell and Lyndon. DEA-1 indicated that he / she did not know the exact house but has met SHUE on the street at that intersection. DEA-1 further stated that SHUE drives a Dodge Challenger Hellcat and a brown Lincoln Town Car, both cars being utilized for the distribution of drugs. DEA-1 provided the cellphone number to SHUE as 313-742-8254. DEA-1 further conducted monitored calls to the aforementioned telephone number further corroborating the number as being the telephone number for SHUE.
>
> 31. DEA-1 stated that he/she obtains two ounces of cocaine and 20 grams of heroin from SHUE every morning and then pays him $3,400 in cash at the end of the day. The next day the cycle is repeated, SHUE providing the days narcotics on consignment and receiving payment at the end of the day. DEA-1 further stated that SHUE conducts transactions in this manner with various other street dealers. More specifically, DEA-1 stated that another street dealer who distributes for MILES received $8,000 in cocaine from SHUE through DEA-1 during the week this affidavit was authored.

(*Id*. at 12-13). It then includes separate sections that detail: 1) the surveillance and identification of Miles (*Id*. at 14-18); 2) the utilities and property records that were obtained for the two premises (*Id*. at 18-19); 3) the criminal history of Miles (*Id*. at 19-20); and 4) an interview of a cooperating Defendant through the Canton Police Department (*Id*. at 20-21). Sams' affidavit then summarizes:

> 49. Given the above described information, I believe that Brandon MILES is involved in the distribution of multiple types of dangerous drugs in and around the city of Detroit. I further believe that MILES is utilizing TARGET PREMISES 1 and TARGET PREMISES 2 to help facilitate his drug trafficking activities. More specifically I know from my training and experience that drug traffickers frequently use multiple locations to store drugs and drug proceeds.
>
> 50. In this instance, TARGET PREMISES 1 has been linked to MILES in various database checks to include his criminal history as an offender address. MILES brown Lincoln Town Car is stored at the residence behind a locked fence. The Lincoln Town Car has been identified as being utilized by MILES as a

vehicle that he (MILES) utilizes to traffic narcotics in. Furthermore, the surveillance from October 3, 2019, MILES was observed in the Dodge Hellcat parking in the driveway of the residence, remaining there for approximately 15 minutes then departing the area. MILES then traveled to the area of Bramell (TARGET PREMISES 2) and began squaring blocks, travel patterns I know from my training and experience to be consistent with counter surveillance techniques. Neither vehicle identified by DEA-1 are registered to MILES, this too, is consistent with drug traffickers in the fact that persons trafficking in narcotics frequently utilized vehicles that are not in their names to avoid law enforcement being able to determine the actual driver of the vehicle.

51. I further believe that MILES is in possession of a large amount of narcotics proceeds. I believe this due to the information provided by DEA-1. DEA-1 stated MILES collects approximately $3,400.00 a day from DEA-1 in narcotics proceeds. On a seven (7) day week, this would amount to MILES obtaining $23,800.00 a week from DEA-1, who is just one (1) of MILES street level dealers.

52. Knowing that drug traffickers frequently keep drugs and drug proceeds in various locations; the amount of trafficking it is believed that MILES is conducting on a weekly basis; I believe TARGET PREMISES 1 will yield to the seizure of articles more thoroughly described in Attachment B.

53. In respect to TARGET PREMISES 2, I believe that MILES is utilizing this address to store his narcotics. I believe this in part because of the information provided by DEA-1 that MILES will go to TARGET PREMISES 2 prior to providing DEA-1 narcotics. This description of events was then corroborated on October 2, 2019, through the described monitored call and surveillance where MILES flashed DEA-1 a baggie of what DEA-1 believed to be narcotics then traveling back to TARGET PREMISES 2. Furthermore, TARGET PREMISES 2 is also linked to MILES through various databases to include the Deed of the property.

(*Id*. at 21-25).

Magistrate Judge R. Steven Whalen issued the requested search warrants on October 3, 2019. It is undisputed that they were executed on that same date, that Miles was arrested during the execution of the search warrant at the Bramell Street house, and that Miles gave a statement to police the next day, October 4, 2019.

**ANALYSIS**

Defendant's Motion to Suppress challenges the two search warrants that authorized searches of the homes on LaSalle and Bramell Streets, the search of the Lincoln Town Car during the execution of the search warrant on LaSalle Street, and Defendant's custodial statement given on the day after the searches.

## I. Challenge To The Search Warrants

In his Motion to Suppress, Defendant challenges both of the search warrants. Defendant argues that there was not sufficient probable cause to support either of the search warrants. Defendant further argues that the affidavit in support of the search warrants is a "bare bones" affidavit such that any application of the *Leon* good-faith exception the exclusionary rule would be inappropriate in this case.

### A. Probable Cause And Nexus

In a recent decision, the Sixth Circuit concisely explained the applicable probable cause standard that applies to a search warrant:

> The Fourth Amendment commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A magistrate reviewing a search warrant application considers whether the information in the affidavit adds up to "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238-39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Probable cause requires a connection or nexus between the evidence sought and the place to be searched. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). That connection must not be vague or generalized, *id*. at 595, and must "present sufficient facts demonstrating why the police officer expects to find evidence in the residence," *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (citing Carpenter, 360 F.3d at 595). That determination is made from the "totality of the circumstances," *Florida v. Harris*, 568 U.S. 237, 244, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013), keeping in mind that "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation," *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 588, 199 L.Ed.2d

5

453 (2018). *See, e.g., United States v. Christian*, 925 F.3d 305, 309-12 (6th Cir. 2019) (en banc).

*United States v. Acosta-Barrera*, __ F. App'x __, 2020 WL 3956851 at * 4 (6th Cir. July 13, 2020).

In response to the motion, the Government asserts that the warrant established probable cause to search the two houses. It asserts that the affidavits showed a fair probability that Miles was an active drug dealer, and law enforcement surveillance and investigation established the nexus between the residences and Miles's drug activity. (Govt.'s Br. at 7).

The Government first contends that the informant referenced in the affidavit was both reliable and corroborated. The Court agrees.

Where there is no prior "track record of credibility" between the informant and the search warrant affiant, the officer is required "to take steps to test the informant's veracity." *United States v. Crawford*, 943 F.3d 297, 306 (6th Cir. 2019). "For example, the officer could verify key information received from the informant, where plausible to do so." *Id*. at 307. "Or the officer could identify multiple sources providing the same information receiving the same information, increasing the likelihood that the tip is reliable." *Id*. Here, the officer did both of those things, as explained in the Government's brief:

> In October 2019, Michigan State Police troopers arrested DEA-1with fentanyl, powder cocaine and cocaine base. Affidavit, 12. DEA-1 immediately agreed to cooperate with the DEA in hopes of consideration for the arrest. DEA-1 identified its source of supply for the seized narcotics, a black male nicknamed "Shue." *Id,* 11-12. Additionally, DEA-1 explained that Shue provided DEA-1 two ounces of cocaine and 20 grams of heroin "every morning," for which DEA-1 pays Shue $3,400 the next day. Id., 13. DEA-1 also described how Shue distributed drugs to other customers including $8,000 in cocaine to another customer that week. *Id*., 13-14.
> In addition to information of Shue's active drug dealing, DEA-1 provided specific information identifying Shue, including the general location of his house

> (near the intersection of Bramell and Lyndon streets in Detroit), Shue's cellphone number, and the two vehicles Shue used to distribute narcotics—a Dodge Challenger Hellcat and a brown Lincoln Town Car. Id., 12-13. On October 2 and 3, 2019, DEA conducted extensive surveillance to independently corroborate these details. Id., 14-18. Agents found a burgundy Dodge Hellcat at 14421 Bramell Street – eight houses south of the intersection of Bramell and Lyndon streets – and saw Miles exit the side door of the house, enter the Hellcat and drive off. *Id.*, 14. Agents later showed DEA-1 the driver's license photograph of Brandon Miles, whom DEA-1 identified as Shue. *Id.*, 15. Agents also saw Miles drive to 15801 LaSalle Street on October 2 and 3 where a brown Lincoln Town Car was parked in the driveway. *Id.*, 14 and 17. Thus, the agents verified DEA-1's information when they confirmed Shue's identity as Miles, identified Shue's house and his two cars.
>
> The agents further corroborated DEA-1's information by having DEA-1 make a controlled phone call to Miles in the evening of October 2, while at the same time watching Miles at his Bramell residence. *Id.*, 16. Agents monitored DEA-1's call to Miles at the number DEA-1 previously provided to the agents. Miles stated he was coming to meet DEA-1 in 10 minutes. Nine minutes later, agents saw Miles leave the Bramell residence and drive the Hellcat to an agreed upon meet location. *Id*. At the meet, per DEA-1, Miles was the only occupant of the Hellcat, and showed DEA-1 a bag of narcotics. After the meeting, Miles immediately returned to the Bramell house. *Id.*, 17. Based on the controlled call and DEA-1's information about the details of the meeting, agents corroborated Miles was an active drug dealer.

(Govt.'s Br. at 8-10). Thus, the officers sufficiently verified DEA-1's reliability.

The affidavit established a sufficient nexus between illegal activity and the two premises to be searched. As to the Bramell Street house:

> The concurrent surveillance surrounding DEA-1's meeting with Miles, established sufficient nexus between Miles's illegal activity and his Bramell residence. Because Miles departed Bramell and traveled directly to meet DEA-1 with drugs and returned thereafter, agents reasonably inferred that Miles kept drugs at the Bramell residence. *Coleman,* 923 F.3d at 457-58 (*See, e.g., United States v. Bucio-Cabrales*, 635 F. App'x 324, 334 (6th Cir. 2016) (evidence defendant traveled to two addresses—one of which was home—prior to narcotics sales supported inference he was storing narcotics at one residence); *United States v. Gunter,* 266 F. App'x 415, 419 (6th Cir. 2008) ("[T]he instant affidavit describes an incident where law enforcement agents observed Defendant visiting his residence right before he traveled to the site of a drug sale....This evidence, combined with the affiant's statements that he has significant experience in narcotics investigations, is sufficient to establish a nexus between Defendant's

7

illegal activities and his residence.")).

(Govt.'s Br. at 10-11). As to the LaSalle Street house:

> Regarding LaSalle, Agents saw Miles travel to the LaSalle house on October 2 and 3. Each time, Miles stayed at the house for a few minutes and left. Affidavit, 14-15, 17. On both days they also saw the other car Miles used for distribution, the Town Car, parked in the driveway of LaSalle. *Id*., 15, 17. On October 3, 2019, after the agents saw Miles stay at LaSalle for 15 minutes, Miles drove to the area of his Bramell house and then started driving in a manner consistent with counter-surveillance. Miles drove passed the house and starting squaring around the blocks. *Id*., 17 -18.

(*Id*. at 11-12).

The agents conducted additional investigation to confirm Miles's connect to both the Bramell and LaSalle Street houses, as detailed in the Government's Brief.

This Court agrees with the Government that, under the totality of the circumstances, the information in the affidavit established a fair probability that evidence of a crime (ie, evidence related to Miles's drug trafficking) would be found in both of the premises.

And even if the issue of whether the affidavit provided sufficient connection between the evidence sought the two premises to be searched were "debatable," that issue would not need to be resolved by the Court because the *Leon* good faith exception would apply, as explained below. *United States v. Acosta-Barrera, supra*, at *5 ("Whether the affidavit provided sufficient connection between the evidence sought and the place to be searched is debatable, but we need not resolve that question because the Leon good faith exception applies.").

### B. *Leon* Good Faith Exception

Defendant argues that the affidavit in support of the search warrants in this is a "bare bones" affidavit, such that application of the *Leon* good-faith exception would be inappropriate

in this case.

In *United States v. Acosta-Barrera*, the Sixth Circuit set forth standard that applies to that argument:

> "When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). The Supreme Court recognized an exception to the exclusionary rule for evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Leon*, 468 U.S. 897, 905, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). To decide whether the *Leon* good-faith exception applies, the court must decide "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id*. at 922, 104 S.Ct. 3405 n.23. Although there are four circumstances outlined by the Court in *Leon*, defendants relied only on the third scenario. *Id*. at 914-15, 104 S.Ct. 3405. That is, defendants argued that the officers relied "on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " *Id*. at 923, 104 S.Ct. 3405 (citation omitted).
>
> "An affidavit that is so lacking in indicia of probable cause that no reasonable officer would rely on the warrant has come to be known as a 'bare bones' affidavit." *United States v. Gilbert*, 952 F.3d 759, 763 (6th Cir. 2020) (citing *United States v. White*, 874 F.3d 490, 498 (6th Cir. 2017)). That label is reserved for an affidavit that "merely 'states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.' " *Christian*, 925 F.3d at 312 (quoting *United States v. Washington*, 380 F.3d 236, 241 n.4 (6th Cir. 2004)). For an officer's reliance on a warrant to have been objectively reasonable, the affidavit need only "contain 'a minimally sufficient nexus between the illegal activity and the place to be searched.' " *Brown*, 828 F.3d at 385 (quoting *Carpenter*, 360 F.3d at 596). Because this a lesser standard than probable cause, the affidavit "need not establish a 'substantial basis,' only 'some connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched.' " *McCoy*, 905 F.3d at 416 (quoting *White*, 874 F.3d at 497). In other words, "[a]ll that's required in the *Leon* context are facts that show a nexus and that are not 'so vague as to be conclusory or meaningless.' " *Ardd,* 911 F.3d at 351 (quoting *Carpenter*, 360 F.3d at 596).

*United States v. Acosta-Barrera*, supra, at *5.

Here, the Affidavit that supported the search warrants was not a "bare bones" affidavit

9

(ie., one so lacking in indicia of probable cause that no reasonable officer would rely on the warrant). As such, even if this Court were to conclude that affidavit failed to establish the requisite probable cause, the good faith exception to suppress would apply in this case.

## II. Challenge To The Search Of Lincoln Town Car

Defendant's motion also asserts that a "warrantless search was made of a Lincoln Town car at the LaSalle residence and suspected drugs, money, jewelry and papers were seized." (Def.'s Motion at 2). Defendant asserts that the "warrantless search of the car was illegal and does not fall within any vehicle exception." (*Id.*).

In response to this challenge, the Government asserts that the Town Car was properly searched as a vehicle found within the curtilage during the execution of the search warrant at the LaSalle Street residence. Alternatively, the Government asserts that "the agents could also search the Town Car under the automobile exception." (Govt.'s Br. at 2).

### A. Curtilage

The Government asserts that the officers could search the Lincoln Town Car because it was within the curtilage of the LaSalle residence. In support of that argument, the Government asserts that "[w]hen agents executed the search warrant at the LaSalle residence, Miles's Town Car was within the curtilage – parked in the driveway, inside a privacy fence." (Govt.'s Br. at 16). The Government states that the "Sixth Circuit has agreed with a majority of courts upholding 'the search of a car on the premises, even where the search of the vehicles was not expressly included in the wording of the warrant, regardless of whether it was owned or controlled by the owner of the premises searched." (Govt.'s Br.) (Citing *United States v. Thompson*, 91 F.3d 145 (6th Cir. 1996); *United States v. Combs*, 468 F.2d. 1390 (6th Cir. 1972).

The Government asserts that it was clear that the Lincoln Town Car was within the curtilage of the LaSalle residence on the date of the search, where it was on the driveway, inside a privacy fence. Moreover, the Government correctly notes that the search warrant expressly *included* vehicles located on the premises.

Defendant's reply brief does not address this argument. As such, Defendant has not disputed that the Lincoln Town Car was on the driveway at the premises, inside the fence, at the time of the execution of the search.

Under Sixth Circuit authority, a search is authorized "of a car on the premises, even where the search of vehicles was not expressly included in the wording of the warrant, regardless of whether it was owned or controlled by the owner of the premises searched." *United States v. Thompson*, 91 F.3d 145 (6th Cir. 1996); *Combs, supra*; *United States v. Scott*, 2018 WL 2197911 (E.D. Mich., J. Berg, 2018) ("Although the warrant did not explicitly authorize the search of vehicles, any vehicles within the curtilage of the residence fall within the scope of the warrant's authorization" under *Thompson* and *Combs)*. As such, the search of this vehicle was authorized.

    **B.**    **Automobile Exception**

The Government also argues, alternatively or additionally, that the automobile exception also supports the agents' search of the Lincoln Town Car. This argument was not addressed in Defendant's reply brief. Moreover , the Court need not reach that alternative argument given this Court's ruling that the search was proper as the vehicle was within the curtilage of the premises searched.

**III.**    **Challenge To Custodial Statement**

The searches occurred on October 3, 2019. The Government's response states that

11

Defendant was interviewed the following day, October 4, 2019. (Govt.'s Br. at 5). The Government asserts that Defendant "understood his rights and agreed to speak with the agents." (*Id.*). It states that the "interview was audio and video recorded." (*Id.*).

Defendant's motion asserts that his "custodial statement is derived from" the allegedly unlawful searches of the properties and Lincoln Town car "and therefore is the product of either or both of the illegal seizures. As such, it is the fruit of the poison tree." (Def.'s Motion at 2). In support of this argument, Defendant states:

> The exclusionary rule prohibits the introduction [of] derivative evidence, tangible or testimonial, that is the product of the primary evidence or acquired as an indirect result of the illegal search. Wong Sun v United States, 371 US 471 (1963). Defendant was arrested in the house which was illegal searched. His warrantless arrest and subsequent custodial statement were the product of that illegality.

(Def.'s Br. at 7).

The Government asserts that "[b]ased on probable cause or at least under good faith," as discussed in its brief, "the agents legally found evidence in the basement of Bramell to arrest Miles based on probable cause for the illegal possession of guns and ammunition as a felon, and possession with intent to distribute narcotics." (Govt.'s Br. at 23-24). The Government asserts that the "agents' post-*Miranda* interview of Miles the next day would not be fruit of the poisonous tree. Based on the valid search warrant, good faith, and the evidence found at Bramell, Miles' post-*Miranda* statement should not be suppressed." (Govt.'s Br. at 24).

This argument is derivative of the above arguments that the searches were conducted in violation of Defendant's constitutional rights. Given this Court's rejection of those arguments, this argument also fails.

**CONCLUSION & ORDER**

For the reasons set forth above, IT IS ORDERED that Defendant's Motion to Suppress is DENIED.

IT IS SO ORDERED.

                                                s/Sean F. Cox  
                                                Sean F. Cox  
                                                United States District Judge

Dated:  August 14, 2020